UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| J. KEVIN GARVEY, | ) | |
| | ) | |
| Plaintiff, | ) | 08 C 1093 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| PIPER RUDNICK LLP LONG TERM DISABILITY | ) | |
| INSURANCE PLAN, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

J. Kevin Garvey, a former partner at the law firm now known as DLA Piper LLP, applied

for long-term disability benefits from the Piper Rudnick LLP Long Term Disability Insurance

Plan. Standard Insurance Company, the Plan's insurer and claims administrator, denied the

application, and Garvey sued the Plan under § 502(a)(1)(B) of the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to challenge the denial. After the court held

that Standard's denial is subject to the deferential standard of review, 2011 WL 1103834 (N.D.

Ill. Mar. 25, 2011), the parties cross-moved for summary judgment. The Plan's motion is granted

and Garvey's motion is denied.

**Background**

The following facts are undisputed. Garvey was a partner in the law firm's real estate

practice for many years. On March 1, 2004, he began working part-time and collecting short-

term disability benefits from the law firm's short-term disability plan; the law firm itself funded

the short-term plan and had the discretionary authority to award benefits. Garvey retired one year

later, on March 1, 2005. Shortly before retiring, Garvey applied to the Plan for long-term

-1-

disability benefits effective on his anticipated retirement date. The Plan was funded through a group long-term disability insurance policy issued by Standard. Standard also served as the Plan's claims administrator and had discretionary authority to determine a participant's entitlement to benefits. Doc. 85-6 at 49; Doc. 168 at ¶ 6.

Plan documents provide that "[y]ou are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform with reasonable continuity the Material Duties of your Own Occupation." Doc. 85-6 at 128; Doc. 162 at ¶ 8; Doc. 168 at ¶ 3. The terms "Own Occupation," "Material Duties," and "Mental Disorder" are defined as follows:

> Own Occupation means any employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as your regular and ordinary employment with the Employer. Your Own Occupation is not limited to your job with your Employer.
>
> Material Duties means the essential tasks, functions, and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation.
>
> Mental Disorder means any mental, emotional, behavioral, psychological, personality, cognitive, mood or stress-related abnormality, disorder, disturbance, dysfunction or syndrome, regardless of cause, including any biological or biochemical disorder or imbalance of the brain. Mental Disorder includes, but is not limited to, bipolar affective disorder, organic brain syndrome, schizophrenia, psychotic illness, manic depressive illness, depression and depressive disorders, or anxiety and anxiety disorders.

Doc. 85-6 at 128, 136; Doc. 162 at ¶ 8; Doc. 168 at ¶¶ 3-4. To be eligible for long-term disability benefits, a claimant had to be disabled for one year. Doc. 85-6 at 125, 128; Doc. 162 at ¶¶ 8-9; Doc. 168 at ¶ 4.

Garvey's application claimed that he had become disabled on March 1, 2004 due to mental disabilities (stress and anxiety) and physical disabilities (a herniated disc in his back,

arthritis in his fingers, and elbow problems), all of which caused him "constant pain and anxiety." Doc. 85-2 at 120; Doc. 162 at ¶ 17; Doc. 168 at ¶ 10. Garvey asserted that the disabilities were caused by physical deterioration and the need to take care of his severely disabled adult son. Doc. 85-2 at 120; Doc. 168 at ¶ 10. Garvey's application was accompanied by Attending Physician's Statements and medical records from Garvey's physicians—a psychiatrist, Dr. Howard Herman; two orthopaedic surgeons, Dr. Michael Haak and Dr. Brian Hartigan; and an internist, Dr. James Miller. (An Attending Physician's Statement is a form that insurers like Standard prepare and that a claimant's physician(s) complete for submission with the claimant's application for benefits. *See Black v. Long Term Disability Ins.*, 582 F.3d 738, 742 (7th Cir. 2009); *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 906 (7th Cir. 2008).) The application also was accompanied by medical records from Garvey's cardiologist, Dr. Stuart W. Rosenbush. The law firm provided Standard with this description of Garvey's occupation:

> Mr. Garvey is a real estate practitioner and performs various activities in connection with real estate acquisitions, dispositions and commercial lease transactions. These activities include document preparation and negotiation, due diligence and real estate closings. He also undertakes client development and consultation functions as well as training and continuing legal education activities.

Doc. 85-5 at 97; Doc. 162 at ¶ 36.

Garvey first saw Dr. Herman, his psychiatrist, on September 21, 2004, over six months after he claims to have become disabled. Doc. 168 at ¶ 18. Garvey complained of stress, sleeplessness, decreased concentration and work performance, lost drive at work, and decreased appetite and weight loss. Doc. 85-5 at 20-22; Doc. 168 at ¶ 18. Garvey next saw Dr. Herman on October 12, 2004; the session notes from that appointment reflect that Garvey was taking Ambien, that he still suffered from sleeplessness, and that the need to take care of his severely

disabled son was a source of stress. Dr. Herman diagnosed Garvey with "Anxiety Disorder with mixed features" and prescribed an antidepressant. Doc. 85-2 at 172; Doc. 168 at ¶ 19. The session notes from the next appointment, which took place on November 5, 2004, state that Garvey had stopped taking the antidepressant because he found it intolerable, that he continued to take Ambien, that his mood was "stable, calm," and that his condition was "improved." Doc. 85-2 at 171; Doc. 168 at ¶ 20. Dr. Herman's session notes from January 26, 2005, state that Garvey was "calm, stable," that he was sleeping fine with Ambien, and that his "Anxiety NOS" was "controlled." Doc. 85-2 at 170; Doc. 168 at ¶ 21.

In his Attending Physician's Statement, which is dated November 30, 2004, Dr. Herman diagnosed Garvey with "anxiety not otherwise specified" ("anxiety NOS") with a "good" prognosis. Doc. 85-5 at 19; Doc. 162 at ¶ 25; Doc. 168 at ¶ 11. The Attending Physician's Statement states that although Garvey's condition was "improved," he suffered from a "high degree of anxiety/stress with poor concentration and low energy impair work functionality" and would never be able to return to work. *Ibid*.

Dr. Haak treated Garvey's back condition. On July 31, 2003, Dr. Haak diagnosed Garvey with lumbar degenerative disc disease and lumbar radiculopathy, and prescribed "conservative care," including physical therapy, injection therapy, chiropractic care, massage therapy, and prescription pain medication (Vioxx). Doc. 85-4 at 74; Doc. 168 at ¶ 28. At a follow-up examination on August 21, 2003, Dr. Haak found Garvey to be "significantly better," with the pain "75% improved," and opined that Garvey's condition should resolve itself with conservative care. Doc. 85-5 at 73; Doc. 168 at ¶ 29. On October 19, 2004, Garvey was evaluated by a physical therapist for low back pain, and the therapist prescribed a physical therapy regimen.

Doc. 85-4 at 70; Doc. 168 at ¶ 30.  On December 9, 2004, Garvey again saw Dr. Haak for back pain, and Dr. Haak prescribed conservative care and gave Garvey samples of prescription pain medication.  Doc. 85-4 at 67-68; Doc. 168 at ¶ 31.

In his Attending Physician's Statement, which is dated December 22, 2004, Dr. Haak diagnosed Garvey with lumbosacral disc degeneration, lumbar disc displacement, and lumbosacral neuritis.  Doc. 85-5 at 15; Doc. 162 at ¶ 27; Doc. 168 at ¶ 12.  The Attending Physician's Statement describes Garvey's physical limitations as "difficulty sitting for long periods, difficulty with movement and stiffness," but he does not place any duration limits for sitting, standing, or walking.  Doc. 85-5 at 15; Doc. 168 at ¶ 12.  Dr. Haak left blank the entries on the Attending Physician's Statement regarding the dates he recommended that Garvey should cease working and could return to work.  Doc. 85-5 at 15.

Dr. Hartigan treated Garvey's left thumb and elbow conditions.  Dr. Hartigan first saw Garvey on August 12, 2002, diagnosed him with arthritis in his left thumb, and prescribed pain medication and gave him a thumb splint.  Doc. 85-3 at 26; Doc. 168 at ¶ 32.  Dr. Hartigan saw Garvey on September 23, 2002, November 18, 2002, January 13, 2003, and March 15, 2004; the session notes reveal that Garvey continued to experience tolerable pain, received a steroid injection in his thumb, and indicated that he did not wish to have surgery.  Doc. 85-3 at 21-25; Doc. 168 at ¶ 33.  At the March 15, 2004 examination, where Garvey complained of right elbow pain when lifting objects, Dr. Hartigan diagnosed him with right elbow medial epicondylitis (tennis elbow), advised Garvey to avoid underhand lifting and forceful forearm rotation, and prescribed physical therapy.  Doc. 85-3 at 21-22; Doc. 168 at ¶ 34.

Garvey next saw Dr. Hartigan several months later, on November 10, 2004, and complained of experiencing increased thumb and elbow pain after he stopped taking the Vioxx that had been prescribed for his back pain. Doc. 85-3 at 18-19; Doc. 168 at ¶ 35. Dr. Hartigan noted that Garvey did not complete the physical therapy that he had been advised to undertake, so Dr. Hartigan again prescribed physical therapy and pain medication, and gave Garvey a new thumb splint because he had lost his old splint. *Ibid.* On November 17, 2004, Garvey saw a physical therapist, who prescribed treatment consisting of stretching exercises, myofascial release, therapeutic modalities, taping techniques, ice, and home exercises. Doc. 85-3 at 32; Doc. 168 at ¶¶ 36-38. Garvey scheduled his first physical therapy appointment for November 22, rescheduled it for November 24, and then cancelled the November 24 appointment. Doc. 85-3 at 34; Doc. 168 at ¶ 39.

In his Attending Physician's Statement, which is dated December 3, 2004, Dr. Hartigan diagnosed Garvey with left thumb arthritis and left medial epicondylitis, stated that Garvey had a "weak grasp/lift," advised that Garvey was unable to lift or carry more than ten pounds, and gave no other work limitations. Doc. 85-5 at 18; Doc. 162 at ¶ 26; Doc. 168 at ¶ 13. The Attending Physician's statement indicated that Dr. Hartigan was unable to determine when Garvey could return to work. Doc. 85-5 at 18.

Garvey saw Dr. Miller, the internist, only once, on December 10, 2004. Doc. 85-5 at 28. Dr. Miller reviewed Garvey's medical history and ordered blood tests, but did not prescribe any new treatment. *Id.* at 2-3; Doc. 168 at ¶ 17. In his Attending Physician Statement, Dr. Miller summarized Garvey's ailments and stated that he concurred with Dr. Herman's diagnosis that Garvey should not return to work. Doc. 85-5 at 28-29; Doc. 162 at ¶ 28; Doc. 168 at ¶ 14. Dr.

Miller opined that as Garvey's son "gets older, I think the stress of trying to deal with his son's condition, the demands of his job and Mr. Garvey's medical problems identified above will be overwhelming to the point of preventing Mr. Garvey from performing any of the meaningful functions which are required of the partners in his law firm." Doc. 85-5 at 29; Doc. 168 at ¶ 14.

Dr. Rosenbush, the cardiologist, has monitored Garvey since a 1999 surgery to correct a congenital heart defect. Doc. 85-4 at 18; Doc. 168 at ¶ 40. The corresponding medical records show that although Garvey had high cholesterol and congenital heart disease, he had not suffered any complications from the surgery. Doc. 85-3 at 58-59, 62-64; Doc. 162 at ¶ 41; Doc. 168 at ¶ 40. In June 2004, Dr. Rosenbush noted that Garvey walks two miles two to three times a week, and in November 2004, he noted that Garvey was "exercising regularly." Doc. 85-3 at 44, 47; Doc. 168 at ¶ 41.

After receiving Garvey's application, Standard asked three consulting physicians to review Garvey's medical file. Dr. Linda Toenniessen, a psychiatrist, reviewed the materials bearing on Garvey's mental condition. Dr. Toenniessen found that the "material appears to document only anxiety complaints," and noted that Garvey did not see a psychiatrist until September 21, 2004, over six months after he claimed to have become disabled. Doc. 85-3 at 41-42; Doc. 168 at ¶ 42. Dr. Toenniessen added that Garvey's "stressors were the changes in [his] job and his concerns related to a disabled adult child," and that "[t]here appears to have been nothing new occurring [at the time of his disability] except that the claimant was progressing toward retirement." Doc. 85-3 at 41-42; Doc. 168 at ¶ 43. She concluded that "the diagnosis 'anxiety not otherwise specified' or 'adjustment disorder with mixed features' would not prevent employment as an attorney." Doc. 85-3 at 42; Doc. 162 at ¶ 38; Doc. 168 at ¶ 44.

Dr. Steven Beeson, an internist, and Dr. David Waldram, an orthopaedist, reviewed the materials bearing on Garvey's physical condition. Dr. Beeson noted that Garvey had been treated infrequently, that he had not received aggressive treatment—he had not been referred to a pain clinic, had received only one epidural steroid injection, and was only taking over-the-counter anti-inflammatory medication—and that he had not completed a physical therapy program. Doc. 85-3 at 8; Doc. 168 at ¶ 47. Further, Dr. Beeson noted that Garvey did not see Dr. Haak for his back condition between September 2003 and December 2004 even though he claimed to have become disabled on March 1, 2004. Doc. 85-3 at 7, 9; Doc. 168 at ¶ 46. From Garvey's treatment history, Dr. Beeson concluded:

> [Garvey's] back pain is mild to moderate in nature and clearly not a limiting condition for a sedentary occupation. He may need to be allowed to change positions frequently. Neither the osteoarthritis of the thumb nor the lateral epicondylitis could in any way be expected to limit him from a sedentary or light work occupation. His cardiac condition is clearly well compensated and in no way would limit him from any occupation.

Doc. 85-3 at 8; Doc. 162 at ¶ 45; Doc. 168 at ¶ 47.

Dr. Waldram concurred. He noted that Garvey had received only infrequent treatment for his back condition and was taking only anti-inflammatory medication for the pain. Doc. 85-2 at 179; Doc. 168 at ¶ 48. Dr. Waldram concluded that while Garvey had degenerative changes in his back, thumb, and elbow consistent with his age, those problems "would not limit him in regard to sedentary to light physical activity" so long as he was allowed to change positions throughout the day. Doc. 85-2 at 179; Doc. 162 at ¶ 47; Doc. 168 at ¶ 49.

On May 5, 2005, Standard denied Garvey's application for long-term benefits. Doc. 85-2 at 54-59; Doc. 162 at ¶ 49; Doc. 168 at ¶ 51. Standard classified Garvey's job as sedentary work pursuant to the Department of Labor's Dictionary of Occupational Titles ("DOT"), and

"considered that [Garvey's] occupation requires the ability to concentrate and analyze information to perform detailed transactions." Doc. 85-2 at 57-58; Doc. 85-5 at 31; Doc. 168 at ¶ 50. Standard's denial relied primarily on the opinions of the three consulting physicians. Doc. 85-2 at 56-58. Standard found it particularly pertinent that Garvey did not see Dr. Haak or Dr. Herman for his back and psychiatric conditions, respectively, until months after he claimed to have become disabled; that Garvey did not experience an exacerbation of mental or physical symptoms contemporaneous with his date of claimed disability; and that Dr. Haak and Dr. Hartigan did not provide a date on which they recommended that Garvey cease work. Doc. 85-2 at 58.

Garvey appealed the decision on October 18, 2005. Garvey argued that Standard erred by classifying his occupation as normal sedentary work instead of considering whether he could perform with reasonable continuity the material duties of a real estate partner—namely, handling complex legal matters, generating business, participating in firm administration, and meeting high billing requirements. Doc. 85-2 at 42-45; Doc. 162 at ¶¶ 53-54; Doc. 168 at ¶ 54. Along with the appeal, Garvey submitted additional materials that had not accompanied his original application: an operative note from a recent surgical procedure to repair a torn retina, which Garvey claimed added to his stress and anxiety; additional session notes from Dr. Herman; and a letter from Dr. Herman dated October 17, 2005, one day before Garvey submitted his appeal. Doc. 162 at ¶ 55; Doc. 168 at ¶ 56. The operative note states that Garvey tolerated the eye procedure well. Doc. 85-2 at 161-62; Doc. 162 at ¶ 57. Dr. Herman's session notes from April 29, 2005 state that Garvey's son had been hospitalized, that Garvey was under "considerable stress" and "tearful at moments," and that Garvey did not believe he could handle the stress from

work; the session notes from June 30, 2005 state that Garvey had stopped taking Ambien and was struggling with sleeplessness and was stressed; and the session notes from September 15, 2005 state that Garvey's mood plummeted after he had eye surgery, that he continued to struggle with sleeplessness and would start taking Ambien again, that he was frustrated with Standard's denial of his claim, that Garvey had "Depression NOS," and that Dr. Herman would consider prescribing an antidepressant if symptoms continued or worsened. Doc. 85-2 at 164-69; Doc. 162 at ¶ 58; Doc. 168 at ¶¶ 22-24. Dr. Herman's October 17, 2005 letter stated that it had been his belief since the beginning of treatment that Garvey could not perform the duties of a law firm partner because he "is emotionally exhausted and would be overwhelmed by stress and anxiety in the work setting"; the letter also referred to Garvey as suffering from depression. Doc. 85-2 at 163; Doc. 162 at ¶¶ 59-61; Doc. 168 at ¶¶ 25-27.

Standard postponed consideration of Garvey's appeal while it took account of the new materials he had submitted. After reviewing those materials, Dr. Toenniessen adhered to her prior conclusion regarding Garvey's mental condition. Doc. 85-2 at 155-56; Doc. 162 at ¶ 62; Doc. 167 at ¶ 58. On November 23, 2005, Standard informed Garvey that it had rejected his claim even after considering the new materials. Doc. 85-2 at 34-39; Doc. 162 at ¶ 64; Doc. 168 at ¶ 58. Standard also noted that the eye surgery did not affect Garvey's claim because it occurred after he had ceased working, and thus at a time when he was no longer covered by the Plan. Doc. 85-2 at 38.

Standard then considered Garvey's appeal, referring the matter to its Quality Assurance Unit, where three new consulting physicians reviewed Garvey's claim. Doc. 85-2 at 26-27; Doc. 162 at ¶ 66. Dr. Esther Gwinnell, a psychiatrist, reviewed Garvey's psychiatric records. She

noted that Garvey did not seek psychiatric treatment until over six months after he claimed to have become disabled; that he initially complained of decreased concentration and difficulty with work performance; that he was calm and stable until the middle of 2005, at which point he began to have increased depressive symptoms; that the primary treatment consisted of taking Ambien as a sleep aid; and that he tried taking an antidepressant only once and had found it intolerable. Doc. 85-2 at 136; Doc. 168 at ¶ 61. Dr. Gwinnell concluded that Garvey's treatment was inconsistent with a severe psychiatric illness that would limit his ability to function as an attorney; she explained that the treatment addressed not extreme anxiety or depression, but rather sleep difficulties and a suspicion of depression that was never diagnosed. Doc. 85-2 at 136-37; Doc. 162 at ¶ 69; Doc. 168 at ¶ 63. Dr. Gwinnell also concluded that even if Garvey had some psychiatric symptoms, they were not contemporaneous with his claimed date of disability. Doc. 85-2 at 136; Doc. 168 at ¶ 62. Dr. Gwinnell rejected the conclusion in Dr. Herman's October 17, 2005 letter that Garvey could not work, finding that conclusion contradicted by Dr. Herman's contemporaneous treatment notes. Dr. Gwinnell reasoned that if Garvey truly had the significant anxiety or depression claimed by Dr. Herman, then she would have found in Dr. Herman's session notes a discussion of the anxiety or depression and a treatment plan, such as medication, relaxation exercises, self-hypnosis, biofeedback, cognitive behavioral therapy, psychotherapy, and/or self-help guidance. Doc. 85-2 at 137-38; Doc. 168 at ¶¶ 64-67. Dr. Gwinnell also observed that Dr. Herman's session notes reflected that Garvey had denied suffering from depression. Doc. 85-2 at 137; Doc. 168 at ¶ 64.

Dr. Mark Shih reviewed Garvey's medical records relating to his hand, back, and elbow problems. Dr. Shih found that the records showed degenerative changes in Garvey's back

consistent with his 1971 laminectomy surgery and with his age; that there were no neurological issues with his back; that an x-ray of his thumb showed "mild changes"; that he received minimal treatment for his elbow; and that he wanted to continue golfing and was able to take long walks. Doc. 85-2 at 149-50; Doc. 168 at ¶ 68.  Dr. Shih concluded that the records did not support the claim that Garvey was unable to work in a sedentary occupation, with the caveat that Garvey be allowed to change position throughout the day and not be required to lift more than 10-20 pounds on an occasional basis.  Doc. 85-2 at 150-51; Doc. 162 at ¶ 67; Doc. 168 at ¶ 70.  Dr. Shih noted that the records demonstrated that Garvey was able to lift his 85 pound son on a repeated basis. Doc. 85-2 at 151.  Dr. Shih also observed that Garvey's hand, back, and elbow problems were largely not contemporaneous with his claimed date of disability.  Doc. 85-2 at 150; Doc. 168 at ¶ 69.  Dr. Shih noted that the only medical appointment occurring near the claimed date of disability (March 1, 2004) was his March 15, 2004 appointment with Dr. Hartigan, in which Garvey followed up on his thumb condition and complained about new elbow pain.  *Ibid*.  Dr. Shih observed that Garvey claimed that the elbow pain began about a year earlier, in April 2003. *Ibid*.

Dr. Bradley Fancher reviewed Garvey's cardiac records.  Dr. Fancher found that Garvey had a congenital cardiac condition (a leaky valve), but that the records did not document any cardiac symptoms other than possible palpitations in November 2004.  Doc. 85-2 at 131; Doc. 162 at ¶ 71; Doc. 168 at ¶ 71.  Dr. Fancher concluded that Garvey would not be precluded from a sedentary occupation.  *Ibid*.

On January 5, 2006, Standard informed Garvey that his appeal was denied.  Doc. 85-2 at 13-24; Doc. 162 at ¶ 73.  Standard explained that it used the Department of Labor's classification

of Garvey's job as sedentary only in regards to Garvey's alleged physical disabilities.  Doc. 85-2 at 15-16; Doc. 168 at ¶ 72.  Relying on the consulting physicians, Standard concluded that Garvey's physical ailments did not preclude him from a sedentary occupation.  Doc. 85-2 at 18-20; Doc. 168 at ¶¶ 73-75.  As for Garvey's alleged psychiatric problems, Standard "acknowledge[d] that the performance of the material duties of [Garvey's] own occupation would require a significant degree of executive functioning."  Doc. 85-2 at 22; Doc. 168 at ¶ 77.  However, Standard agreed with Dr. Toenniessen and Dr. Gwinnell that Garvey's medical records did not document psychiatric illness that would cause occupational impairment—Garvey did not see a psychiatrist until over six months after he claimed to have become disabled; the psychiatric appointments were infrequent (seven appointments in one year); and the session notes lacked documentation of a diagnosis of or treatment for severe anxiety or depression.  Doc. 85-2 at 21-22; Doc. 168 at ¶ 66.  Doc. 85-3 at 21-22; Doc. 168 at ¶ 34.  Standard also declined Garvey's request that it speak with Dr. Herman, explaining that Dr. Herman's treatment notes provided a sufficient basis to assess the claim.  Doc. 85-2 at 23.

## Discussion

Where a plan administrator has discretionary authority to determine eligibility for benefits, "the court applies a … deferential standard, seeking to determine only whether the administrator's decision was 'arbitrary and capricious.'"  *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010) (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008)).  As noted above, the court has determined that the arbitrary and capricious standard applies here.  Under that standard, the court "looks to whether the plan administrator communicated specific reasons for its determination to the claimant, whether the plan administrator afforded the

claimant an opportunity for full and fair review, and whether there is an absence of reasoning to support the plan administrator's determination." *Frye v. Thompson Steel Co.*, 657 F.3d 488, 492 (7th Cir. 2011) (internal quotation marks omitted). "Questions of judgment are left to the plan administrator, and it is not [the court's] function to decide whether [the court] would reach the same conclusion as the administrator. Put simply, an administrator's decision will not be overturned unless it is downright unreasonable." *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006) (brackets and citations omitted); *see also Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006) ("under an arbitrary and capricious review, neither this Court, nor the district court, will attempt to make a determination between competing expert opinions."). "However, '[r]eview under the deferential arbitrary and capricious standard is not a rubber stamp and deference need not be abject.'" *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 360 (7th Cir. 2011) (quoting *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003)).

The undisputed facts of record, set forth in detail above, show that Garvey received a full and fair review of his long-term disability benefits claim and that Standard provided ample and persuasive reasons for its denial. Standard sought the opinions of Dr. Gwinnell and Dr. Toenniessen regarding Garvey's psychiatric condition, and both concluded that the medical records did not support Garvey's submission that he became disabled by stress and anxiety on March 1, 2004. The doctors supported their conclusion by pointing out that Garvey did not seek psychiatric treatment until six months after he claimed to have become disabled; that the psychiatric treatment was infrequent; and that the treatment primarily addressed Garvey's sleep disturbances. As for Garvey's back, elbow, and thumb ailments, Standard consulted Dr. Beeson,

Dr. Waldram, and Dr. Shih, each of whom concluded that those physical ailments would not prevent him from working as an attorney so long as he were allowed to change positions throughout the day and not required to frequently lift heavy objects. Those three doctors based their conclusions on the diagnoses of the treating doctors and the fact that Garvey received only conservative care; they also noted that Garvey's back problems were not contemporaneous with his date of claimed disability, as he did not visit Dr. Haak until nine months later. Finally, Standard consulted Dr. Fancher regarding Garvey's cardiac condition. Upon a review of Garvey's records, Dr. Fancher concluded that Garvey's cardiac condition would not hinder him in sedentary employ.

Garvey argues that several of the consulting physicians were unreliable. In an effort to show that Dr. Toenniessen was biased, Garvey cites six court decisions referencing her consulting activities on Standard's behalf. Only one of those decisions criticized Dr. Toenniessen, *see Dinh v. Standard Ins. Co.*, 636 F. Supp. 2d 1158, 1165-66 (D. Colo. 2007), while the others found no fault with her opinions, *see Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1190 (D. Kan. 2010); *Nevitt v. Standard Ins. Co.*, 2009 WL 4730316, at *6 (N.D. Ga. Dec. 3, 2009); *McDowell v. Standard Ins. Co.*, 555 F. Supp. 2d 1361, 1368 (N.D. Ga. 2008); *Kirchner v. Long Term Disability Ins. Plan No. 503*, 2007 WL 5601013, at *11 (W.D. Wis. Mar. 19, 2007); *Schwob v. Standard Ins. Co.*, 2006 WL 752855, at *5 (W.D. Okla. Mar. 20, 2006). And the *Dinh* court's criticism of Dr. Toenniessen's opinion in *that* case does not make unreasonable Standard's reliance on her opinion (and those of the other physicians) in *this* case. The Seventh Circuit has warned that sampling problems render useless this type of "batting average approach," in which prior adverse court decisions are used to infer bias on the part of a

plan administrator. *Holmstrom*, 615 F.3d at 767-68. The batting average approach is no more useful for establishing the bias of consulting physicians, for it is possible that Dr. Toenniessen has consulted in hundreds of cases where her opinions were not and could not fairly have been challenged.

Garvey also contends that Dr. Fancher and Dr. Waldram were not well qualified due to a history of malpractice. This contention is a non-starter because Garvey did not submit facts regarding their alleged malpractice in his Local Rule 56.1 statements, which are the only proper vehicle to submit facts on summary judgment. *See* N.D. Ill. L.R. 56.1(a)(3), 56.1(b)(3); *Byrd-Tolson v. Supervalu, Inc.*, 500 F. Supp. 2d 962, 966 (N.D. Ill. 2007) ("facts are properly presented through the framework of the Rule 56.1 statements, and not through citation in the briefs to raw record material"). Even putting aside the Local Rule 56.1 violation, the court is limited on deferential review to the record before the claims administrator. *See Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009) ("When review is deferential—when the plan's decision must be sustained unless arbitrary and capricious—then review is limited to the administrative record.") (emphasis omitted); *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 981-82 (7th Cir. 1999). The administrative record includes no evidence of malpractice. Finally, even if Dr. Fancher's and Dr. Waldram's alleged history of malpractice was properly before the court, Garvey does not dispute that both doctors were licensed physicians. It was not unreasonable for Standard to rely on the opinions of licensed physicians, even those with some past instances of malpractice, as state licensing bodies are in a far better position than this court to police the competency of physicians.

Garvey raises several other objections to the propriety of Standard's denial. First, he argues that Standard failed to consider that his "Own Occupation" was the demanding position of a partner in a large law firm and not that of a generic attorney as defined by the Department of Labor's guidelines. Garvey is incorrect. In denying Garvey's appeal, Standard made clear that it used the generic classification of an attorney only to evaluate Garvey's alleged physical disability. Doc. 85-2 at 15-16. Standard cannot be faulted for using this generic classification, as the physical demands placed on a partner at a large law firm do not differ materially (if at all) from those placed on any other attorney. As for the mental requirements of Garvey's job, Standard considered the material duties of Garvey's position at the law firm and concluded that while they "would require a significant degree of executive functioning," the medical documentation did not support Garvey's disability claim. *Id*. at 22. Further, Standard specifically asked Dr. Gwinnell to evaluate Dr. Herman's claim that Garvey "has lost his ability to persist in tasks required of a partner and that he would be unable to handle complex legal matters with reasonable continuity or keep up with the high hourly billing demands of a partner." *Id*. at 137. Dr. Gwinnell concluded that that claim was unsupported by the contemporaneous medical records. *Id*. at 137-38. Dr. Toenniessen likewise considered and rejected that claim when reviewing the additional materials submitted by Garvey. *Id*. at 155-56. Thus, Standard actually determined whether Garvey was disabled from performing as a partner at the law firm and not merely from performing the generic position of attorney.

Second, Garvey argues that Standard failed to consider the "co-morbidity" of Garvey's various impairments. Because Garvey did not exhaust that argument in Standard's administrative review process, Doc. 85-2 at 42-45, he may not now challenge the denial of

benefits on that ground. *See Edwards*, 639 F.3d at 360-61. The argument fails on the merits in any event. Standard considered Garvey's ailments *in toto* and found that he was not disabled. Doc. 85-2 at 22 ("In summary, you have claimed disability as of March 1, 2004 due to herniated disc, arthritis, anxiety and depression. Although you have remained in treatment for these conditions, we do not find the medical evidence in your claim file supports occupational impairment to a degree that would preclude full-time regular work activity."). Standard did utilize separate consulting physicians when evaluating Garvey's separate ailments, but it can hardly be faulted for doing so. It would have been unreasonable for Standard to ask Dr. Gwinnell, a psychiatrist, to evaluate Garvey's back issues, or to ask Dr. Shih, who practices physical medicine, to evaluate Garvey's anxiety.

Third, Garvey maintains that Standard improperly credited the opinions of its consulting physicians, who simply reviewed the medical files and Attending Physician's Statements, over the opinions of Garvey's treating physicians. But the law allows insurers to rely on the opinions reached by consulting physicians after reviewing a claimant's medical files. As the Seventh Circuit has explained:

> In such file reviews, doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation. It is reasonable, therefore, for an administrator to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations.

*Davis*, 444 F.3d at 577; *see also Black*, 582 F.3d at 745-46; *Sperandeo v. Lorillard Tobacco Co.*, 460 F.3d 866, 876 n.9 (7th Cir. 2006) ("obtaining an independent medical examination is an option, not an obligation, for plan administrators") (internal quotation marks omitted); *Semien*, 436 F.3d at 812-13; *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir. 1998). Nor

are the opinions of treating physicians entitled to special weight. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Standard's decision to credit the opinions of its consulting physicians "amid such conflicting medical evidence is a question of judgment that should be left to [Standard] under the arbitrary-and-capricious standard." *Davis*, 444 F.3d at 578; *see also Semien*, 436 F.3d at 812 ("the district court [will not] attempt to make a determination between competing expert opinions").

This case is not one where the file review physicians all drew different conclusions than the treating physicians. *Compare Holmstrom*, 615 F.3d at 774-75, *with Davis*, 444 F.3d at 577. Of all the treating physicians, only Dr. Herman, the psychiatrist, opined in his Attending Physician's Statement that Garvey was disabled. Doc. 85-5 at 19. By contrast, in their Attending Physician's Statements, Dr. Haak and Dr. Hartigan did not indicate a date on which Garvey had become disabled, Dr. Haak did not state that Garvey could not return to work, and Dr. Hartigan was "unable to determine" when Garvey could return to work. *Id.* at 15 (Dr. Haak), 18 (Dr. Hartigan). True, Dr. Miller opined that Garvey was disabled, but he can hardly be called a treating physician. Garvey saw Dr. Miller only once, shortly before filing his disability claim, and at that appointment, Dr. Miller only took a blood test and reviewed the Attending Physician Statements of Garvey's treating physicians. Doc. 85-5 at 29. Given this, Standard cannot be faulted for discounting Dr. Miller's views. Nor can Standard be faulted for discounting the disability determination in Dr. Herman's Attending Physician's Statement and subsequent letter, as the information conveyed in Dr. Herman's own contemporaneous session notes belie the disability determination. *See Davis*, 444 F.3d at 578 ("Most of the time, physicians accept at face value what patients tell them about their symptoms; but administrators must consider the

possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk.") (internal quotation marks and brackets omitted); *Bumpas v. Unum Life Ins. Co. of Am.*, 2005 WL 2428537, at *5 (M.D. Fla. Sept. 30, 2005) ("It was not unreasonable for Defendant to rely on the contemporaneous treatment notes of Plaintiff's physicians, rather than the post hoc certification of disability."); *Sweeney v. Standard Ins. Co.*, 276 F. Supp. 2d 388, 397 (E.D. Pa. 2003) ("Though the letters from [the claimant's] doctors stated that [the claimant] was disabled, [the plan] was justified in relying on the information in [the claimant's] contemporaneous treating physician chart notes over the physician letters written after [the claimant] filed his disability claim.").

Fourth, Garvey contends that because in-person examinations are critical to psychiatric diagnoses, the consulting psychiatrists' opinions carry little weight. Some district courts do favor in-person psychiatric examinations over file reviews. *See Haisley v. Sedgwick Claims Mgmt. Servs., Inc.*, 776 F. Supp. 2d 33, 49-50 (W.D. Pa. 2011); *Schwarzwaelder v. Merrill Lynch & Co.*, 606 F. Supp. 2d 546, 559-60 & nn.44-45 (W.D. Pa. 2009); *Troy v. Unum Life Ins. Co. of Am.*, 2006 WL 846355, at *10 & n.2 (S.D.N.Y. Mar. 31, 2006); *Sheehan v. Metro. Life. Ins. Co.*, 368 F. Supp. 2d 228, 255 (S.D.N.Y. 2005). The Seventh Circuit, however, has not adopted that position. *See Black*, 582 F.3d at 745. The court therefore adheres to settled Supreme Court and Seventh Circuit precedent holding that the opinions of consulting physicians who review a claimant's files should not be given less weight than the opinions of the claimant's treating physicians. *See Nord*, 538 U.S. at 834; *Black*, 582 F.3d at 745-46; *Davis*, 444 F.3d at 577; *Semien*, 436 F.3d at 812-13; *Hightshue*, 135 F.3d at 1148.

Even if a treating psychiatrist's opinion deserved special weight, a claim administrator would not be categorically required to accept that psychiatrist's opinion. This case well illustrates the point. As noted above, Dr. Herman's session notes do not document serious anxiety or depression, and indicate only conservative treatment. Moreover, Garvey did not even see a psychiatrist until over six months after he claimed to have been disabled. Given these facts, Standard reasonably rejected the opinion in Dr. Herman's Attending Physician's Statement and subsequent letter in favor of the consulting psychiatrists' opinions.

Finally, Garvey contends that Standard had a conflict of interest because it both determined Garvey's eligibility for benefits and was responsible for paying those benefits. *See Glenn*, 554 U.S. at 112. Although this conflict does not change the standard of review from deferential to *de novo*, the court must take the conflict into account. *See id.* at 115; *Edwards*, 639 F.3d at 364. The Seventh Circuit "is still pondering … just *how* to consider a plan administrator's conflict of interest," explaining:

> On the one hand, *Glenn* might require a reviewing court to consider a plan administrator's conflict of interest in all cases, mixing it in somehow with all other relevant factors. *Marrs* [*v. Motorola, Inc.*, 577 F.3d 783 (7th Cir. 2009),] acknowledged that this court endorsed that reading in its early decisions applying *Glenn*, pointing in particular to *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir.2009).
>
> But *Marrs* expressed discomfort with a standard of decision "in which unweighted factors mysteriously are weighed" and instead adopted a "more directive" reading of *Glenn* that focuses on the "gravity" of a plan administrator's conflict of interest. *Marrs*, 577 F.3d at 788-89. *Marrs* takes the position that the gravity of the conflict, and thus the likelihood that the conflict influenced the plan administrator's decision, should be inferred from the circumstances of the case, including the reasonableness of the procedures by which the plan administrator decided the claim, any safeguards the plan administrator has erected to minimize the conflict of interest, and the terms of employment of the plan administrator's staff that decides benefit claims. *Id*. at 789.

-21-

*Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 482 (7th Cir. 2009) (some citations omitted). This issue does not appear to have been resolved. *Compare Edwards*, 639 F.3d at 364 (citing *Marrs* for the proposition that "[i]t is … not the existence of a conflict of interest … but the *gravity* of the conflict, as inferred from the circumstances, that is critical."), *with Holmstrom*, 615 F.3d at 767 (citing *Glenn* for the proposition that the conflict of interest is "weighed as a factor in determining whether there is an abuse of discretion").

Regardless of how the issue is resolved, Standard's conflict of interest does not materially affect the outcome of this case. Garvey argues that the gravity of the conflict is shown by Standard's selective consideration of evidence; its failure to provide the consulting physicians with a description of Garvey's job; and its failure to apply the Plan's definition of disability. Doc. 163 at 7; Doc. 178 at 3; Doc. 185 at 4. None of these alleged facts find support in the record. Standard considered all the evidence submitted by Garvey, as well as the opinions of its consulting physicians, and reasonably relied on the latter. The consulting physicians were adequately informed of Garvey's occupation; they knew that Garvey worked as an attorney, a sedentary occupation, and the consulting psychiatrists considered Dr. Herman's submission that Garvey could not perform the material duties of a law firm partner. Finally, there is no question that Standard appropriately applied the Plan's definition of disability. Standard cited the correct definition, Doc. 85-2 at 15, and it applied that definition to Garvey's material job duties after consulting with physicians who were also aware of those duties, *id*. at 22. Besides the non-existence of any indicia suggesting a grave conflict of interest, this is simply not a close case in which an ordinary structural conflict tips the scales. Standard's decision was well-supported by the opinions of its consulting physicians, which in turn were well-supported by Garvey's medical

records, and therefore survives deferential review.  *See Black*, 582 F.3d at 748; *Fischer v. Liberty Life Assurance Co. of Boston*, 576 F.3d 369, 377 (7th Cir. 2009); *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861-62 (7th Cir. 2009).

## Conclusion

For the foregoing reasons, Standard's denial of Garvey's claim for long-term disability benefits was reasonable.  Consequently, the Plan's summary judgement motion is granted, and Garvey's summary judgment motion is denied.  Judgment is entered in favor of the Plan and against Garvey.

March 30, 2012

_____

United States District Judge